Argued October 27, modified November 18, 1953

## HIXSON *v.* HIXSON

263 P. 2d 597

See also, 263 P. 2d 603.

*Lyle R. Wolff,* of Baker, argued the cause and filed a brief for appellant.

*William L. Jackson* argued the cause for respondent. On the brief were Dunn & Jackson, of Baker.

Before LATOURETTE, Chief Justice, WARNER, ROSSMAN, LUSK and TOOZE, Justices.

TOOZE, J.

This is an appeal by plaintiff, Celestine Hixson (now Randall), from an order of the circuit court for

Baker county, entered April 27, 1953, modifying the final decree of divorce (as modified) respecting the custody of minor children.

Plaintiff and defendant were married at La Grande, Oregon, on March 10, 1936. Three daughters were born as the lawful issue of this marriage; viz., Gwendolyn, born December 6, 1940; Arletha, born April 23, 1943; and Lornalee, born November 1, 1944.

Plaintiff separated from defendant in October, 1945, taking her children with her. On December 23, 1945, plaintiff commenced suit for divorce against defendant, charging him with cruel and inhuman treatment consisting of physical abuse, threats against her life, and mental torture. Defendant defaulted. The case was heard on January 23, 1946, and the charges in plaintiff's complaint were sustained not only by her own testimony, but also by that of a corroborating witness. The trial court entered written findings of fact wherein it found to be true the several allegations of physical abuse, threats by defendant, and mental torture as set forth in the complaint. As a part of its findings of fact, the court also found: "That plaintiff is a woman of good habits and does not drink, smoke, attend shows, dances or parties" and "that plaintiff is a proper person to have the care, custody and control of said children".

On January 24, 1946, a final decree was entered in said suit in favor of plaintiff, awarding her a divorce, and providing as follows relative to the children:

"And it hereby is further ordered, adjudged and decreed that plaintiff be, and she hereby is given the care, custody and control of the three minor children, issue of said marriage between plaintiff and defendant, to wit: Arletha Hixson, born April 23, 1943; Lornalee Hixson, born November 1, 1944

and Gwendolyn Hixson, born December 6, 1940 and defendant may see and have said children with him for short visits at all reasonable times, subject to the further order of this court, provided however, that he shall not take said children or any thereof without the County of Baker, nor shall he at any time remove said children or any thereof from the City of Baker without the consent of the court after due notice to plaintiff, first had and obtained, and provided further, that defendant pay to the clerk of this court on the 15th day of each and every month commencing with the 15th day of February, 1946, the sum of $40.00 for the use and benefit of plaintiff in supporting and maintaining said minor children.''

The ink upon the final decre had hardly dried before defendant commenced a course of litigation that has built up a bizarre court record of self-interest, at the sacrifice of the happiness and welfare of minor children. Since the date of the final decree, some 60 to 70 documents, including motions, affidavits, counteraffidavits, and writs of assistance have been filed in this case, all relating to the custody of the children. In each separate instance, defendant instigated the proceedings.

On April 5, 1946, he filed a motion to modify the decree by awarding custody of said children to him. The motion was supported by his affidavit. The chief complaint was that plaintiff would not permit defendant to take the children away from their home, even for short periods of time. An order to show cause was issued and served upon plaintiff, and she appeared by motion and affidavit. She denied the allegations contained in the affidavit of defendant. The record does not show any final disposition of the matter.

On February 16, 1948, defendant filed his second motion to modify the decree (1) either by awarding him

absolute custody, or (2) by awarding him custody during the summer months of each year, and also the right to take the children to his home once each month for a week-end period. His affidavit in support of his motion charged plaintiff with lack of cooperation in seeing that he was protected in his rights of visitation as provided in the final decree. Plaintiff appeared on March 16, 1948, by filing a countermotion asking that defendant be deprived of all right of visitation or contact with said children. Plaintiff had remarried in the meantime. In her affidavit, plaintiff charged:

"That defendant has repeatedly interfered with the care and control of said children by insisting upon visiting with them at improper times, taking them with him over long intervals when they should be taking their naps, should be confined to the home on account of colds, illness and the like, and at times when they were engaged in activities such as birthday parties, during their nap period and the like."

The matter came on for hearing on May 11, 1948, and on May 12, 1948, an order was entered modifying the decree as follows:

"It is hereby ORDERED, ADJUDGED and DECREED that plaintiff be, and she hereby is given the care, custody and control of the three minor children of plaintiff and defendant [naming them] from September 1st to the following June 1st of each year, beginning with the year 1948; and that defendant be and he is hereby given the care, custody and control of said three minor children of plaintiff and defendant [naming them] from June 1st to September 1st of each year, beginning with the year 1948; provided, that during the times plaintiff has the care, custody and control of said minor children of plaintiff and defendant hereunder, defendant shall have the right to visit said children of plaintiff and defendant and to have

them with him for not to exceed eight hours at a time, and during the day time, once each month; and that during the times defendant has the care, custody and control of said minor children of plaintiff and defendant hereunder, plaintiff shall have the right to visit said children for not to exceed eight hours at a time, and during the day time, once each month; and provided further that none of said children shall be removed from Baker County, Oregon, by either the plaintiff or defendant or any other person or persons without the written consent of this Court.''

Pandora's Box was opened by this modification providing for divided custody. This court has always frowned upon decrees which provided for such, because experience has taught that such custody does not usually tend to promote the best interests of the minor child or children. It is only under very exceptional circumstances that divided custody will be approved.

On June 1, 1948, defendant filed a motion for a writ of assistance, to be directed to the sheriff of Baker county, for aid in securing the custody of the children. In his affidavit filed in support of the motion, defendant alleged that when he called at plaintiff's home on June 1 to get the children ''plaintiff instructed me that I would have to 'come in and get the kids' and failed, neglected and refused to bring them to the front door; that said minor children were crying and hiding * * *.'' An order was entered on June 1, 1948, directing the issuance of a writ of assistance, and on the same day the writ was issued, directed to the sheriff and commanding him ''to go and enter upon and into the premises occupied by the plaintiff, or were ever [sic] said minor children may be, and remove said minor children therefrom, and deliver them, together

with their effects, into the possession of the defendant".

Evidently the sheriff was unsuccessful in executing the first writ, because on June 14, 1948, a second writ was issued and placed in his hands for execution. The sheriff executed this writ, took possession of the children over their protests, and delivered them to the defendant.

On January 20, 1949, defendant filed another motion for modification of decree, asking that the custody of the children be taken from the mother and awarded to him. In his affidavit filed with the motion, defendant alleged that when he called for the children on June 1, 1948, he and his mother were not permitted to enter the front yard of plaintiff's home, but "that the children finally showed themselves and were in a hysterical condition". It was then he secured the writ of assistance above mentioned. He further stated that after he had obtained custody (through the sheriff), the children "very shortly reverted to their normal condition, and were no longer hysterical". He then alleged certain difficulties he encountered in taking the children with him on several monthly eight-hour periods, but he did not charge that plaintiff had at any time arbitrarily refused him temporary custody. The gist of his complaint was that plaintiff lent him no active assistance and encouragement in the enforcement of his rights. Plaintiff appeared by filing a countermotion asking that the order for divided custody be vacated. On July 11, 1949, after a hearing, the court modified the decree by awarding plaintiff custody from August 1 to the following June 1, and defendant custody from June 1 to August 1, instead of June 1 to September 1.

On June 7, 1950, defendant filed a motion for another writ of assistance to secure possession of the children. The writ was issued on that day and executed by the sheriff of Baker county, as to Gwendolyn and Arletha, despite the fact that said children did not want to leave their mother and were very nervous and emotionally upset. Lornalee clung to her mother and simply refused to go, and the sheriff did not attempt to use force upon her.

Defendant on October 23, 1951, filed a motion to modify the decree, again asking that custody of the children be awarded to him, and also that plaintiff be adjudged guilty of contempt of court. The motion was supported by defendant's affidavit. An order to show cause was issued and served upon plaintiff. Plaintiff filed a counteraffidavit in which she denied any wilful violation of the orders of the court. Some of the allegations of her affidavit are noteworthy:

"4. On one occasion in December, 1949, I refused him [defendant] permission to take Arletha outside our home because she had a heavy cold and was running a temperature. I did, however, invite him to come to the house and visit the children which he did.

"5. During the winter of 1950 Gale developed rheumatic fever and Dr. Hansen ordered me not to allow Gale to play outdoors. I explained this to Hixson.

"6. Except for the two foregoing occasions, due to illness, I have never on any occasion refused Hixson his right to take the children away from my home once each month for 8-day [sic] periods.

"* * * * *

"8. In the summer of 1950 Hixson had custody of Gwendolyn and Arletha. It is untrue that I denied him custody of Lornalee or any of the chil-

dren. I was perfectly willing then, as always, that all three children should go with their father. On this occasion Lornalee refused to release her hold around my neck after I had released my arms from around her. * * *.

"9. I have never taught the children to hate their father. On the contrary the children never refer to their father in their conversation and the occasion to discuss him does not arise in our household."

After hearing and on December 27, 1951, the court entered an order dismissing the contempt proceeding, but further modifying the decree respecting custody as follows:

"1. By designating the office of the pastor of the Church of Assembly of God at Baker, Oregon, as the place where the plaintiff shall deliver, and the defendant shall re-deliver, the said children whenever the defendant may, upon written request to the plaintiff, exercise his right

"a. to visit the said children on reasonable occasions

"b. to have the said children visit with him for a period not to exceed 8 hours in the daytime on the 3d Saturday of each month provided that if the defendant is unable to exercise such right in any month he shall have the right to an additional Saturday in the next succeeding month

"c. to have the said children visit with him at his home from June 1st to August 1st in each year

"2. By requiring the plaintiff to notify the defendant in writing prior to the time that he is to exercise his rights of visitation or custody of the said children that said children will be unavailable to him if for legitimate reason such as sickness or prearranged plans which would make it impossible for

defendant to exercise his rights as to 1.a above make it impossible for said children to be at the appointed place at the appointed hour.

"3. During the periods from June 1st to August 1st in each year, the defendant shall, upon the written request of the plaintiff, deliver the said children to the pastor of the Church of Assembly of God at Unity, Oregon, or such other person as they may agree upon, to enable the plaintiff to visit the said children on reasonable occasions."

On June 2, 1952, upon motion of defendant, another writ of assistance was issued to enforce the right of defendant to custody of his children. The sheriff attempted to execute the writ, but was unsuccessful in his efforts, as will more particularly appear from a part of his testimony upon the trial of the instant proceeding, as hereafter quoted.

On July 1, 1952, defendant filed a motion, supported by his affidavit, for an order directed to plaintiff to show cause why she should not be held in contempt of court for an alleged wilful violation of the decree of divorce as modified December 27, 1951. On the same day an additional motion was filed asking for a modification of the decree so as to award custody of the children to defendant. Plaintiff appeared in opposition to both motions. On October 24, 1952, plaintiff filed a motion, supported by her affidavit, asking that sole custody be awarded to her, subject to the right of defendant to visit the children at reasonable times. It was upon these several motions that a trial was had resulting in the order adjudging plaintiff guilty of contempt and in an order modifying the decree, from which this appeal was taken.

Fred C. Thom, sheriff of Baker county, testified with reference to his attempt to execute the writ of as-

sistance issued June 2, 1952. We quote briefly from his testimony at the trial as follows:

"Q Will you state to whose home you went?

"A I went to the Randall residence.

"\* \* \* \* \*

"Q And what did you do when you got to the residence?

"A I knocked on the door, and was invited in.

"Q Did you endeavor to take custody of the children?

"A Not that time.

"Q What did you do then?

"A Well, I talked to the Randall family, and asked for the children—asked the children to go with me.

"Q What was the answer?

"A Well, the children refused to go.

"Q And then what did you do?

"A I believe I returned to my office and contacted yourself.

"Q Was Mrs. Randall present at the time you were in the Randall home?

"A Yes.

"Q What happened after you called my office?

"A Well, you came to my office and together we returned to the Randall residence.

"Q And who did you talk to at that time?

"A We talked to Mr. Randall.

"Q What was the result of that conversation, do you remember?

"A Well, Mr. Randall said he would endeavor to persuade these children to go with me the next day, and I agreed to come after them.

"\* \* \* \* \*

"Q Had you ever taken possession of them at any time prior?

"A I had, I believe, the year before. Two of the girls.

"Q. Now the girls said they didn't want to go. Did Mrs. Randall say they couldn't go?

"A No, she never did say they couldn't go.

"Q How did the children act when you said you had come to get them—to take them to visit their father during the summer?

"A The smallest one would immediately go into hysterics, and the older ones would become nervous, and then eventually they would be in tears.

"Q What did the small child do besides going into hysterics?

"A She would cling to her mother and refuse to have anything to do with me.

"Q Did Mrs. Randall refuse to let you take them?

"A No.

"Q Was there anything to prevent you from bodily picking up three little girls?

"A *No, if I had wanted to carry three scared, screaming children out of the house, probably I could have done it.*

"Q That's all." (Italics ours.)

The evidence discloses that the children were examined by Dr. Henry H. Dixon, of Portland. Dr. Dixon is an eminent specialist in the field of psychiatry. It was his expert opinion, based upon the examination, that the mental and physical well-being of these children were definitely and injuriously affected by the insecurity, uncertainty, and tension they suffered as the direct result of divided custody.

From the foregoing recital of the record, it is obvious that these minor children have been used as pawns in the battles between the parents. Under the order for divided custody they have been delivered to one parent and redelivered to the other almost as chattels. This is made more evident by the extraordinary use

of numerous writs of assistance, a writ usually employed to obtain possession of property. They have been forced to do what in their hearts they did not wish to do. It requires no stretch of imagination to picture the feelings of these little girls when the sheriff of the county appeared upon the scene with all the force of a writ and the law behind him. These children are of an age where it is manifest that they have minds of their own and cannot be forced to love anyone, not even a parent. Unquestionably they love and are deeply devoted to their mother, as well they should be. It may also be that they are not too young to realize the humiliation and suffering their mother must have undergone by reason of being constantly haled into court. They may have resented that. If so, it is something of defendant's own making. Considering the record as a whole, we are not surprised that these children are mentally and physically ill.

Manifestly, since the divorce decree was entered in 1946, defendant has paid little real regard for the feelings and best interests of his offspring. The enforcement of his "right" to visitation and to custody was evidently more important to him than the effect such action had upon the children. We may justly surmise that his whole course of conduct was intended only as a means of harassing and annoying the plaintiff rather than arising from a sincere regard for the welfare of these girls.

On the other hand, it is apparent from the record that plaintiff herself has not been wholly free from fault. She could have cooperated more than she did in carrying out the orders of the court. However, the record fails to show that plaintiff ever actively or arbitrarily resisted defendant's enforcement of his

rights. She simply remained passive. She admits that she never taught her children to love and respect their father, but she did not teach them to hate or disrespect him. Plaintiff simply did not discuss the father with the children.

The type of abuse heaped upon plaintiff during the married life of plaintiff and defendant, as established by proof at the trial in the divorce suit, would justly cause any woman to lose her love and respect for her husband. We know of no rule of law that requires a former wife to actively teach her children to love and respect a man who, through his own cruel and inhuman acts, has forfeited his right to respect. On the other hand, the law condemns affirmative acts and words of one parent in disparagement and disrespect of the other in the presence or hearing of the children, no matter how unworthy such other parent may be.

■ The minor children involved in this litigation are the unfortunate victims of a broken home. They are helpless to protect themselves. The court owes them the duty of taking such action as will best serve their interests and welfare. A consideration of parental rights or feelings is secondary in importance.

Of course, minor children are entitled to the love and companionship of both parents, insofar as that is compatible with their welfare. The difficulties between their parents, culminating in divorce, should not deprive them of this any more than is absolutely necessary to their best interests. *Raw v. Raw,* 195 Or 373, 276, 245 P2d 431. But if it is to the children's best interests that the companionship of one parent be denied them wholly or in part, that is the course which must be pursued.

■ The trial court entered a decree modifying the latest modification by limiting defendant's right of custody to one month each year, from July 1 to August 1, but continuing the other provisions thereof.

Regardless of where the blame may lie for the present situation, we face an actual condition and not a theory. At no time has plaintiff been charged with being morally unfit to have the custody of these three girls. The only charges ever made against her was failure to force the children to go with defendant or doing something to prevent defendant from a full exercise of his rights as provided in the decree. We are solely concerned with the welfare of these children, whose lives to date have been rendered miserable by the endless litigation between the parents. That litigation, largely the result of divided custody, must be brought to an end. Plaintiff has had the custody of these children from the time of their respective births, except as interrupted from time to time as herein outlined. She has provided them with a good home, excellent care, and Christian training, and has showered upon them a mother's love and affection. Her present husband treats them as he would his own children and would adopt them were it permitted. These young girls need their mother. *Goldson v. Goldson,* 192 Or 611, 626, 236 P2d 314.

The order of modification of decree from which this appeal was taken, together with the order modifying decree under date of December 27, 1951, and the whole thereof as they relate to the custody and maintenance of the minor children of plaintiff and defendant, shall be and they hereby are vacated, set aside, and held for naught insofar as the custody and maintenance of said minor children are concerned, and

there shall be and there hereby is substituted in lieu thereof and as a modification of the final decree respecting the custody and maintenance of the minor children the following:

"It is further ordered, adjudged, and decreed by the court that the future care, custody, control, and maintenance of the minor children of plaintiff and defendant; viz., Gwendolyn Hixson, Arletha Hixson, and Lornalee Hixon, shall be and the same hereby are awarded to plaintiff, subject to the right of defendant to visit said children in their home at reasonable times.

"It is further ordered, adjudged and decreed that defendant be and he hereby is ordered and directed to pay to the clerk of the court for the use and benefit of plaintiff in the maintenance of said minor children, the sum of $60.00 per month, until further order of the court."

All other provisions of the final decree of divorce, as well as all provisions of the several modifications of decree other than those relating to the custody and maintenance of the minor children, shall remain unaffected by this modification.